Case number 21-7122, Warren R. Harris, appellant versus Muriel Bowser in her official capacity as the mayor of the District of Columbia, et al. Ms. Barron for the appellant, Ms. Johnson for the appellate. Ms. Barron, good morning. Good morning, honors. My name is Angela Barron, and I am pro bono counsel for Mr. Warren Harris. I would like to reserve two minutes for rebuttal. This court should reverse the district court's decision to grant summary judgment and remand the case before a jury trial, because the district court committed two legal errors. First, there are genuine disputes of fact as to whether Mr. Harris presented a risk of danger or elopement, which are material to whether the restraints were a violation of his due process rights. Second, the district court misapplied the professional judgment standard under controlling Supreme Court law in Youngberg v. Romeo. Let me ask you, because I'm confused by what the district court did, and maybe I'm wrong, but it seemed to me, she said, I don't have to decide which, whether Wolfish or Youngberg applies, because both of them have been met. Now, if I'm right in that reading, how there is no evidence that meets Youngberg, and the only evidence about medical judgment is Dr. Wasser, who says it was way beyond this established medical judgment. How do you read how she analyzed the two standards? So she did not get the standard right under Youngberg. Under Youngberg, the state may not restrain an involuntarily committed patient. Well, let me just stop you. Do you read her order as having said, I do not have to decide which one applies because they're both met? Well, under Youngberg, his rights were violated, and under Bell, his rights were violated. And under Youngberg, the hospital did not satisfy the professional judgment standard, and under Bell, the restraints were not reasonably related to the state's security interests, because there was no indication of a security risk. Now, turning to what happened. After years of treatment at St. Elizabeth's Hospital, the hospital granted Mr. Harris privilege E status, giving him the freedom to leave the hospital grounds unsupervised and unrestrained multiple days a week. Now, the hospital has specifically said that Mr. Harris used these privileges appropriately for a year, and recommended his conditional relief on the basis that he was not dangerous to himself or others. That was the whole point of the hearing, wasn't it? St. Elizabeth's wanted the certificate to give him conditional release. Exactly, exactly, Your Honor. So the hospital specifically said that he was not a danger, said that he was able to be conditionally released, but then on the day of the hearing, the hospital subjected him to restraints. Five-point mental restraints. His ankles were bound, his wrists were shackled to a metal waistband. When he arrived at the court, because his belt was needlessly taken away from him, his pants started falling down. So he's standing before a judge in his underwear until court personnel held his pants up for him throughout the hearing. And what's important here is that during summary judgment briefing, the hospital implemented a new policy for NGRI patients, requiring a treating psychologist and psychiatrist to determine whether a patient poses a risk of danger or elopement. Right. But this case arises under the 2015 policy, right? I'm sorry. I'm sorry. This case arises under the 2015 policy, correct? Yes. We're not applying the new policy? No. Right. And also, am I right that sometimes your brief reads as if you're challenging the individual decision with respect to Harris, but the officials who made these decisions were acting pursuant to the policy. So the question before us, I think, is that policy constitution, correct? The 2015 policy. Because if it is, then we affirm, right? Right. So you agree with that? That we are challenging the policy. You're challenging the policy, correct? Yes. Well, we are challenging the policy as it was applied to Mr. Harris. Because this blanket restraint policy that subjects Mr. Harris to restraints who did not pose a risk of danger or elopement demonstrates a professional judgment could not have been exercised. And we don't disagree that blanket restraint policies can be held constitutional. We saw this in BOLU and we saw it in BALCM. But in both of those situations, the patient did not introduce evidence showing that they were not dangerous, which is what sets us apart here. I'm confused a little bit about your answer to Judge Tatel's question. On page 20 of your brief, you say you're challenging, quote, an individual decision, and you say you're not challenging, quote, an across-the-board policy. We're challenging the policy as it was applied to Mr. Harris. Because we're no longer challenging the policy because the policy is moot. It has been since replaced. We are now challenging it as it was applied to Mr. Harris. You keep saying you're challenging the policy as applied to Mr. Harris. I guess, are you challenging the individual, individual correctional officer decision? Someone made a decision to put handcuffs on him. Are you challenging that person's decision to follow the policy? Or are you challenging the policy itself? Yeah, so the hospital's decision to subject Mr. Harris to the policy was not an exercise of professional judgment under Youngberg. See, what I don't understand, I'm confused now. I'm confused because the policy doesn't say anything one way or the other about restraints, right? It does, actually, sorry. It does? It does, yes. Oh, what does it say? The policy says that- I'm talking about the 2015 policy. Yes. At A145, it says that metal restraints will be applied. Right, sorry. Yes, it does say they will be applied. And you concede, I think in your papers, that they're always applied, right? So under the 2015 policy, that the Department of Corrections always applies them, correct? So I don't understand what you mean by as applied. The policy is to transport people with restraint, and that's what happened. Now, are you saying that it's unconstitutional because it didn't have an exception for people who weren't dangerous? Well, yes, because that's directly contradictory to what Youngberg says. Youngberg says that you have to balance the state's interest versus the individual interest. No, no, no, wait. I'm just trying to understand what you're challenging and what the policy says. You're challenging the policy as applied to Harris, right? That's your point. Well, but it isn't true that the only thing we have to look at is the policy, right? Is that policy constitutional? I'm not sure why the particular circumstances of this case have anything to do with that since you've conceded that all people transported under the policy are restrained. But under Youngberg, the restraints must reflect the proper balance between state and individual. Yes, that's the constitutional question. I got it, all right, fine. Yes. Okay, so when we're looking at professional judgment, you say we should look at professional medical judgment, right? Well, we think you should be looking at professional correctional and medical judgment because use of restraints must reflect, it must embrace both security and medical concerns because Mr. Harris is a patient here. He's not a prisoner. Okay, so what would you identify as the single best piece of evidence in the record that supports your argument that this policy is not consistent with professional judgment? That the hospital itself determined and represented to the DC Superior Court that Mr. Harris was not dangerous, which is the very justification for the state's use of restraints here. And just to close out, if this court lets the district court's opinion stand, it is effectively writing Youngberg out of the law because it is affirming that the district court's opinion can restrain patients with mental health issues who are not dangerous. And we're really here today to preserve the longstanding precedent that you cannot grant summary judgment when there are genuine issues of material fact. The hospital's decision to restrain Mr. Harris when it determined that he was not dangerous and not a flight risk, raised a genuine dispute of fact as to whether professional judgment was exercised when Mr. Harris was restrained. Am I correct in saying what you want at bottom is individualized assessment? No, what we want is that is the restraints to be applied when they are necessary. So if you have a blanket restraint policy- How's that different from what Judge Anderson just asked you? Well, so, because if you have a blanket restraint policy that applies to individuals who are determined dangerous, we're not saying that you have to conduct an individual risk assessment every single time before applying restraints. But if a patient has not been diagnosed, clinically assessed dangerous, then you do have to conduct an individual risk assessment. But here we already had a determination that Mr. Harris was not dangerous, but then he was subjected to restraints. So that's just ignoring the hospital's own determination there. All right, we'll give you some time and reply. Thank you. Ms. Johnson. Morning, may it please the court, Holly Johnson for the District of Columbia. The transport policy at issue here, the blanket categorical transport policy, is consistent with the scheme applied by the federal government and several other states. Four circuits have addressed this policy, all have upheld it as constitutional, none have overturned it. And I think that the key point in the way the district court made this decision was that either you apply Bell, which is a broader test, or you apply the more specific Youngberg test that you defer to the professional judgment that is relevant to the question. So the professional judgment for a treatment decision is going to be the professional judgment of a medical professional. The professional judgment of a purely security-driven decision is going to be the professional judgment of the security officials. Isn't it both? You say security, they say medical. Isn't it really both? This policy was issued by the hospital administrator, right? Yes. So it's the hospital administrator's professional standards that we're looking at, correct? And wouldn't a hospital administrator who's responsible for both the hospital and for transporting the prisoners take account of both security and medical considerations? Not necessarily. And I think that it's important to note that there may be closer cases that are both, but there was nothing treatment-related about a transport to court. He wasn't being taken out. No, no, no, I'm talking about the policy. You agree, right? The only thing before us is the 2015 policy, correct? Yes. Okay, and the 2015 policy requires transferring the person to the Department of Corrections and restraints, correct? Correct. Okay, so the question is, is that supported by the relevant professional development, right? Absolutely, yes. And isn't the relevant professional development, professional standards, the standards applied by the hospital administrator who wrote the policy? Isn't that what we look at? Yes, that's what you're looking at. But hospital- So it's not just security, as you say in your brief. It can't be. I feel like I have two answers to this. We consider this an entirely security-driven decision. And a hospital administrator- Excuse me, I'm sorry to interrupt, but you keep saying decision. Do you mean the decision to restrain him or the decision to issue the policy? The decision to issue the policy. Okay, so where in the record is there any indication at all that the hospital administrator, I forgot her name, included that security concerns outweighed any medical concerns? So- Is there anything in there that says that? No, and I can answer this. The record says only that the decision was made by the professional. But what Youngberg says is, the test is not that the government has to explain what that individual who made the decision was thinking at the time. The question is whether a decision was made by the appropriate professional. So at that point, the burden then shifts to the plaintiff, and liability can only be imposed if the plaintiff can establish that the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not actually base the decision on such a judgment. Now, hospital administrators have to consider security as a key critical part of administering a hospital. And Youngberg is about treatment. The restraint in Youngberg was a treatment-based restraint. It was designed to protect that individual from himself in the hospital during treatment. So Youngberg is a very specific situation. In fact, the question in Youngberg is about the right to treatment and the safety versus individual freedom, which were in conflict because that individual was so impaired that he posed a danger to himself and others on a daily basis. He was restrained for hours at a time in the hospital. What we're dealing with here is a correctional question. How do you take someone safely to court? For legal reasons, because he has been adjudicated to be dangerous. And I feel like it's really important to push back on this. The hospital was proposing that Mr. Harris be conditionally released. He was still adjudicated to be dangerous. He had been conditionally released on several occasions before, and on at least one of them, he had committed such a severe crime while conditionally released that he was imprisoned for another three years. He was not non-dangerous. It was just at the point where the hospital, the hospital's opinion was that conditional release was appropriate. This does not mean that it was automatically safe to transport him to court without restraint. And in fact, the professional judgment of the correctional industry, including people who are civilly committed, like under the federal civil commitment system for people found not guilty by reason of insanity, that system requires transport to court in full restraint. Yes. I think I'm probably with you on the due process question, but since you've kind of opened the door to defending the policy on policy grounds, and it does seem odd. The hospital says we're going to let him run around the city without shackles, but on this day, with this transit, public safety requires that he be in shackles? Well, interestingly, even under the new policy, and I know the new policy isn't at issue and the new policy doesn't set a new constitutional standard, but even under the new policy, a person with a class E privilege is not automatically entitled to transport by the hospital as opposed to by the Department of Corrections. That's not, I think, quite as responsive to my question as I was hoping for. I mean, if he's so dangerous that you can't bring him into a courtroom without shackles, it seems like he's probably so dangerous he ought not be released from the hospital. Hopefully, this will be more responsive to what you're asking. I think it's important to consider dangerousness as not an exact science and not a binary concept. So the hospital is making their best guess, really their best guess as to whether he's going to commit a crime. And if you look at what happened in Belew, Belew tried the policy that the department has implemented now. The state tried implementing an individualized policy, and they had to abandon it and go back to a categorical policy because someone tried to escape. Someone that they had individually decided did not need to be handcuffed on a transport tried to escape, so they went back to a categorical policy. And that's why I think the new policy, well, I think is perhaps and probably better policy on the part of the department. Certainly, the department believes it's a better policy. It doesn't set the constitutional floor, and there's risk. There's risk with the department's new policy. Now, the standard for substantive due process is non-punitive. The standard for substantive due process, whether it substantially exceeds the norms. And it- Can you think of any restraint policy in a situation like this that would rise to the level of a due process violation? I can think of a couple, but none of them are in a case exactly like this. I could see Youngberg referring to the appropriate professional making the decision. Let's say a janitorial staff in a mental health hospital decided that it was just easier to clean up if the patients were restrained and weren't complaining or giving them a hard time when they- Right. I mean, I see where there's an expertise issue there, but imagine the chief nurse hospital or the chief administrator of the hospital said, in my expert opinion, it's important that everyone, even the least dangerous patient, be transported to a courthouse, not just in shackles, but in a straight jacket and with the Silence of the Lambs mask. You think that's a due process violation? It might be. I mean, we'd have to look at the evidence. I would think it probably is. I would agree- What kind of test would you apply there? The test is whether it exceeds the norms, the standards, substantially exceeds the norms, the standards. And the norm for people who are part of the criminal justice system, adjudicated, dangerous, I mean, Mr. Harris killed someone. He was found not guilty by reason of insanity, which means that he admitted he did it, and it was because of his mental health. He was plainly part of the system. And transporting them to court in handcuffs is the norm. That is the standard. So what we're looking at here is not whether it was a good idea, not whether Mr. Harris was individually, personally, I mean, what happened to him sounds horrible, but it didn't cause any long-term harm, which is the standard for exceeding the norm. And he hasn't alleged- That's certainly not the standard for a substantive due process violation. The standard for the substantive due process violation is non-punitive. The standard when we get specific to handcuffing, the specific to mechanical restraints, at least within the correctional industry, and you can see this in the record from the expert evidence that we introduced, is that the medical considerations can trump, can outweigh the security considerations only when there is going to be a risk of long-term harm or physical injury. And that's just the standard. Let me, one of the, oh, you go ahead. Let me tell you what I think is purely punitive. And that is to allow a man to stand in front of a court and partially, significantly disrobed, nothing he can do about it. Frankly, I can't believe a judge would allow it to continue. And it was continued. I don't know if, I don't think the record shows why it was continued, but it should have been continued. And there was no excuse to allow that man to stand in a courtroom like this courtroom, not fully and significantly dressed. And that is purely punitive. Your Honor, I'm not gonna disagree- Either that, or they could have, but the idea that, and there is some dispute in the record because you say that he was forced to hold his own pants up. They say, let me finish. They say that the guards held his pants up. I don't know what happened. Either one is, I think, unacceptable, but they could have, and should have, either got a piece of string, said, your Honor, we'll continue this until he has pants on with an elastic band or something, or I don't know, but that was totally punitive. I would like to emphasize that that was not the District of Columbia. That was the United States Marshal Service. I know that. So that's why I say, what happened to him was horrible. That was, it shouldn't have happened. But to blame that on the fact that the department has a policy of having the Department of Corrections transport people because of a security risk is taking one single event and trying to throw- Let me ask you about that policy. I don't think it's in the record, but what is the hospital's policy with respect to other transport that's required? Let's say one of the residents needs surgery that cannot be performed at St. Elizabeth's or has to attend a funeral. My understanding from the record is that the policy in 2015, there's a new policy now, but the policy that we're dealing with now only had to do with transport to court. And there is reason to consider transport to court particularly volatile. What was the policy with respect to going to a funeral or to a hospital for surgery? I believe, and I'm not 100% sure of this, but I believe that the policy was that the hospital would conduct the transport. And so if the hospital's conducting the transport, I don't believe the hospital did restrain. I'm not entirely sure of that. That distinction was not really at the heart of this case. The question was whether this, I mean, the question at the heart of this case is whether Mr. Harris offered any evidence at all, any evidence with regard to exceeding correctional standards or security-based standards. I found it interesting to hear an argument today. His counsel say that she believes correctional standards are appropriate because they have based their entire case on Dr. Wasser's opinion. And Dr. Wasser, first of all, every single time he used the word professional judgment, he stuck the word medical in there. I don't think that was a mistake. And then he specifically said that he believed that medical, that the decision should be solely clinical, that's on page 225 of the appendix, and that it was inherently medical, that's on 483. Basically, Dr. Wasser said correctional decisions, safety-based decisions should have no role at all in the decision as to whether to restrain someone. And so- He also said this, reflexively and automatically using restraints on involuntarily committed forensic patients, absent an individualized and clinically driven risk assessment to justify their use when transporting patients from the hospital to court represents a substantial departure from accepted professional medical judgment. It did, but we contend that there are other things at play besides medical judgment. And the question of whether something is- Well, let me ask you this. How do you read the district judge's order? Do you read it? Well, just how do you read it as far as choosing either Bell or Youngberg? So the district court did not choose. The district court said this passes muster under either this court, the circuit- How did it pass muster under Youngberg when the only expert said this flies way off the radar? Because there's two ways to read Youngberg. You can either read it narrowly and say that it requires professional medical judgment regardless of whether it's a medical decision or a treatment-based decision, or you can read it broadly as Youngberg itself permits. If you look at the language of Youngberg, you can read it broadly as saying any person competent to make the particular decision, it's their professional judgment that's at issue. So is it just semantics? In other words, she would have been clearer if she'd said the district judge, Youngberg doesn't apply here. No, and this is where it gets tricky. So the courts, while all the circuits that have looked at this have found the policy to be constitutional, there is a split on their framework, on their doctrinal approach. And two courts, and I think Ballou is the clearest one, the eighth circuit, but Rosado, the second circuit, follows the same structure. Two courts have said Youngberg applies to people who are civilly committed due to mental health reasons or intellectual disability, but we have to read it broadly to incorporate the expertise of people who are not medical professionals or who are in addition to being medical professionals are considering security-based concerns. Other courts have considered, and with that, I would refer this court to Healy, I think that's the clearest one, and that's the first circuit, has held that the, and also Lane says, and Lane has to do with a different fact pattern, it's not a transport policy, but I think Lane does the best job explaining how Youngberg should only be applied to treatment-based decisions. Youngberg was a treatment-based case, but what the district content is, we don't have a document to specify as to whether Youngberg applies or Bell applies, but if you're gonna apply Youngberg broadly, you need to interpret it broadly, to apply it broadly to non-medical situations and then narrowly require it to satisfy medical professional judgment goes way beyond what Bell envisions with regard to the standard. Even if I agree with you about that, I actually do think that's the right way to interpret it. Going back to your answer to Judge Henderson, when she was focusing on the medical considerations, you said there's more at stake here, but where in the record do we know that the hospital administrator who issued this policy concluded that security concerns outweigh medical? So I have two responses to that, and the first might be less satisfying, which is Mr. Harris didn't challenge whether the appropriate professional was the chief nurse executive or whether it was a security-based decision. So we didn't put on any extra evidence in that regard. But my second response, which will hopefully be more satisfying, is that Youngberg does not require the government to indicate the thought process for the person who made the decision. And I would say with a categorical policy, it's incredibly important not to require that because if a prisoner or a civil committee could challenge a policy that had been drafted 20 years earlier and to require the government to get back to what the individual who's making that decision was thinking makes little sense. Okay, I take your point, but even on your terms then, wouldn't it make sense to assume that a hospital administrator, as opposed to the head of DOC or a doctor,  Well, I think what this court needs to focus on- And that we would look at professional standards for both. I don't think that's right. And I'm gonna explain to you why. For the constitutional standards, for most, but especially for due process concerns, the question is whether the government had a legitimate reason to impose the restriction. So the question is, what is the reason proffered by the government in litigation? It's not what were the reasons at issue, what other factors could be at play. The question is, what is the government's justification for doing this at litigation? And then that is tested by looking at whether it satisfies whatever level of heightened scrutiny. In this one, it has to do with professional judgment or whether it's reasonably related under Bell, whether it greatly exceeds professional norms. Those are how you test whether that is in fact the reason or whether in fact that's a pretext for some sort of punitive nature. So, but even all of that aside, the district presented expert testimony from somebody who served as a associate warden for the Bureau of Prisons, which as I pointed out again, has exactly the same policy. And he explained that the security-based considerations always trump the medical considerations when you're dealing with a lockdown facility like this. I also would refer this court to Cameron. It's a decision cited in my brief from the First Circuit that says that administrators are not bound to do what the doctors say is best, even if the doctors are unanimous in that regard. And that case says in matters of security, the administrator's discretion is at its zenith. Let me ask you about your response that this was the marshal service who did this. Are you saying that somehow the hospital, which abrogated or turned over the security decisions to the Department of Corrections, which then turned it over to the U.S. Marshal once I think the courthouse is entered, that that's something that you're not responsible for? Yes, absolutely. The District of Columbia is not allowed to maintain custody over prisoners inside the courthouse. And the district was in, again, this was not- Well, I'm talking about, I'm not talking about the Department of Corrections as much as St. Elizabeth's. I understand. So a couple of things. First of all, again, this is forfeited. This is not- I see both the Department of Corrections and the marshal service, frankly, as agents of St. Elizabeth's because it was St. Elizabeth's who gave the pro forma approval of we're gonna offload all the security issues to the corrections offices. And then thought better of it when they realized that included in this dragnet were people that they themselves thought should be conditionally released. So again, the question is not based on the department's thinking better or the department's changing its policy. The question is whether in 2015 when this policy existed, it was constitutional. Well, it did change it the same month that he made his motion summary judgment. Yes, they changed their policy and I think they should be applauded for doing so. The last thing we wanna do is be chilling departments from trying to create something above the floor of the constitution. And again, that's something that Bell talks about. There was a double bunking policy in Bell where the plaintiffs in Bell tried to say, well, look, they've stopped double bunking. So clearly that wasn't rationally related to a legitimate government interest. And the Supreme Court said, no, it doesn't have to be the best alternative to be reasonable. But that's not responsive to your question. Let me get back to your specific question about whether St. Elizabeth's is responsible for the US Marshal's actions. This is a question, if the department was going to be responsible for the US Marshal's actions, the department would have had to be on notice that the US Marshal's service was going to allow one of their patients to be in court with his pants down and no way to hold up his pants. There's no evidence in the record. This isn't even an argument that's been raised by Mr. Harris, let alone evidence in the record that the department was somehow on notice and deliberately indifferent, which is what the standard would be for that, if that was the test. The question here is whether the policy, it's the policy being challenged. That's what this litigation has been about, whether the policy violated the constitution. And if this court believes that it did, this court also believes that the United States Bureau of Prisons policy for its civil committed people found not guilty by reason of insanity who also need to be transported to court to determine whether they can be conditionally released. It's exactly the same system. This court would be holding that unconstitutional and creating a circuit split with the four circuits that have upheld the very same policy under this. All right, any more questions? Thank you. Ms. Fearon, why don't you take two minutes? Now at all relevant times, Mr. Harris was a patient of the hospital until he was conditionally released. He was always going to, he was going to be a patient of the hospital. And for that reason, the hospital did not exercise professional judgment under Youngberg when it subjected him to restraints. And the question at the heart of this case is what does Youngberg mean? Youngberg tells us that we need to treat individuals with mental health patients at a higher standard and we cannot subject them to a blanket restraint policy that does not consider their level of dangerousness and their level of risk of elopement. And for that reason, the policy here is clearly unconstitutional and we are here and we agree. We are very happy that we have set a precedent that the policy was changed. We have a policy now that requires the hospital to conduct an individual risk assessment before subjecting them to restraints. And we are here now on behalf of Mr. Harris because he did suffer emotional damages as a result of these restraints and the constitutional violation that the hospital incurred. Do we know from the record why the hearing was continued? I believe the government asked for it to be continued. Why the hearing was continued? Yes. I don't believe that's in the record. All right. Can I get, let me try again for a little bit of clarity on the question that Judge Tatel asked about. You say you're challenging the policy as applied to your client. We are challenging a policy that applies to non-dangerous individuals because that is directly contradictory to Youngberg, which says that you have to balance the use of restraints between the state's interest- Youngberg gives deference to, it gives deference to medical professionals, right? Qualified professionals, yes. And in this case, the nurse executive is a medical professional, right? And in this case, the nurse executive made the policy that's at issue, right? So under Youngberg, shouldn't we defer to the nurse executive's expertise when the nurse executive made this policy? Not if it substantially departs from professional judgment standards. So the very act of executing a policy- So that's the case, right? If we decide that the nurse executive's policy did not depart from professional standards, then you would lose the case, correct? Well, even under, well, but the very act of restraining an individual who is not dangerous is not constitutional under Youngberg. That is not an exercise of- I see there, it seems like you're slipping into the individual decision to restrain this particular policy. First, so are you raising a challenge to the individual decision to restrain this particular individual? No. No, you're raising a challenge to the policy, right? A policy that restrains non-dangerous individuals. And I encourage you to look at UC versus the commissioner because that is a perfect example of a blanket restraint policy that was an exercise of professional judgment. But there's a little bit of question bagging when you say the policy is to restrain non-dangerous individuals. How do we know that they're not dangerous? And you have an argument for why your client was not dangerous, but then that slips into a kind of one-off individual decision-making. But that would, the idea of not knowing whether a patient is dangerous and then subjecting them to restraints is completely contradictory to Youngberg. You cannot restrain an individual, a patient with mental health issues who is not just blanket categorically restrain all individuals without knowing whether they pose a risk of elopement or danger. And that's because restraints have very traumatizing effects on patients and they impose a risk of impeding their mental recovery, which is directly inconsistent with the very purpose of their confinement, which is treatment. What's your response to government counsel's argument that if we ruled for you, we would be also ruling that the Bureau of Corrections, the U.S. Bureau of Corrections, Bureau of Prisons policy is unconstitutional? That's completely incorrect. Well, tell me why. I thought you might say that, but why? Because the direction of correctional's policy applies to inmates. And they introduce evidence from a former corrections officer who has no experience transporting NGRI patients. The standards that they provided only applied to inmates. Here, we have a patient. We have a patient in from St. Elizabeth's Hospital and the relevant standard was offered by Dr. Wasser, who specifically balanced whether the state's, whether the state duty to provide and ensure safety was properly balanced against the individual interests. And he found that this was not an exercise of professional judgment because it unduly weighed in favor of security concerns. Following up on what Judge Walker asked you, we presume that this nurse executive would give deference to her decision that applying restraints to every resident of St. Elizabeth's who was transported to court comports with in a logical medical treatment. You have Dr. Wasser on the other side saying this doesn't comport. So even giving the nurse executive the presumption, isn't this a jury question? If that's the way to look at it? In other words, we've got St. Elizabeth's nurse executive presumed to be making a correct decision and you've got another expert saying not in a million years was this a correct decision. You have to have individualized assessment. That's exactly why Youngberg gave us two factors to satisfy the professional judgment standard. First, is the decision of a qualified professional presumed valid? Second, does that decision substantially depart from professional judgment standards? It does not all rest on the fact that the chief nurse executive executed this policy. We now have to decide whether that decision comports with professional judgment standards. And to have policy, to allow patients to go off campus on and off the hospital grounds, unsupervised, unrestrained, but then subject them to restraints. It's not an exercise of professional judgment here. You did not have an expert testify who was an expert on public safety and security. Well, Dr. Wasser specifically weighed whether because he's a chief medical officer and he has experience with NGRI patients. He specifically said that you do have to consider the safety concerns that a patient like Mr. Harris poses, but you have to balance that against his individual interests and the needs of the patient. I thought he disclaimed the notion that his opinion on whether to restrain clients was being informed by public safety concerns. I'm sorry. I thought the government has this quote in its brief several times. And to be honest, I don't have it at the tip of my fingers, but I get it in about 30 seconds. And your expert is asked, I think repeatedly, you're not an expert on public safety and your opinion is not an opinion about what's in the interest of public safety. And he says, oh no, my opinion is not an opinion about what's in the interest of public safety. My opinion is only about the medical care of your client. So to push back, he does, but he does consider safety concerns. And I would also like to, our issue with Mr. Gravetti is he only considers whether this use of restraints is relevant in the context of restraining inmates. So- Sorry to interrupt, but I, and now it's on appendix 46 and your expert admitted he was not qualified, quote, to offer an opinion on quote, standards for transporting inmates. Well, Mr. Harris isn't an inmate and that's why he's not qualified to offer an opinion on that. Mr. Harris is a patient. So of course he's not going to rebut the expert testimony of a corrections officer who only understands how to transport prisoners. He is here to offer expert testimony on the relevant standards for transporting an NGRI patient. And I would like to point out that Mr. Gravetti, even though he's a corrections officer, specifically admitted that you have to consider professional medical judgment standards when you are transporting an NGRI patient. I want to ask you, following up on that, I want to ask you about a piece of evidence that the district court, I'm sorry, that the government relied on in the district court. It's not in the joint appendix, but the government relied on it. And it's a survey of the National Association of State Mental Health Directors. Are you familiar with that? I am not familiar with that. Well, let me tell you what, State Mental Health Directors. I mean, that sounds a lot like the type of person the chief nurse in this case was who issued the policy. And they asked, let me just ask you what you think about what it said. Tell me what the problem is. They asked the question here, they asked how forensic patients are transported outside the facility. And over half, over half, said that they turn them over to the judicial system, just like here. So why isn't that pretty strong evidence that the chief nurse practitioner, the chief nurse who issued the policy here was acting on the basis of well-accepted professional judgments for people who run institutions of this kind. Well, at the very least, there is a genuine dispute here as to whether the chief nurse executive while executing that policy comports with professional judgment standards. And this should be put before the jury. All right, if there are no more questions, thank you. Okay, thank you, Aaron.
judges: Henderson, Walker, Tatel